**UNITED STATES of America**

**v.**

**Kenneth STEPHENS**

**No. 2:01–CR–66–01.**

United States District Court,
N.D. Georgia,
Gainesville Division.

April 25, 2002.

H. Allen Moye, Office of the United States Attorney, Atlanta, GA, for Plaintiff.

Donald F. Samuel, Garland, Samuel & Loeb, Atlanta, GA, for Defendant.

### MEMORANDUM OPINION

O'KELLEY, Senior District Judge.

At issue in this case is whether, in a criminal prosecution, the government may properly authenticate audio and video surveillance tapes, and thus satisfy the prerequisites for admissibility under the Federal Rules of Evidence, even though the only person present and participating in the electronically recorded conversations, other than the defendant himself, is deceased.

### I. Procedural History

During August and September of 2001, agents from the Regional Drug Enforcement Office of the Georgia Bureau of Investigation ("GBI") conducted an undercover "sting" operation which ultimately resulted in defendant's arrest and indictment on federal methamphetamine trafficking charges. To facilitate its investigation, the GBI enlisted the services of a cooperating witness, or Confidential Informant ("CI"), who contacted defendant by telephone to arrange transactions and, on at least eight occasions, attended face-to-face meetings with defendant during which methamphetamine transactions allegedly took place. Prior to each conversation or face-to-face meeting, in which the CI and defendant were the only participants, GBI agents outfitted the CI with several electronic recording devices, installed electronic surveillance equipment in his automobile, and thereafter closely monitored each contact with defendant.

These efforts produced at least one audiotaped recording of each telephone conversation and at least three audiotaped recordings of each face-to-face meeting. Further, by virtue of a GBI "bullet camera," a tube-shaped video camera strategically placed inside the grill of the CI's automobile, each face-to-face meeting between the CI and defendant was surreptitiously videotaped to some partial extent.

Presumably in anticipation of the government's efforts to offer these video and audio recordings against defendant at trial, defendant filed a "Motion for Notice by the Government of its Intention to Use Evidence Arguably Subject to Suppression" on October 25, 2001 [18–1]. Six days later, on October 31, 2001, the CI was killed in a tragic car crash. See "Death Notices," *The Gainesville Times* (Ga.), Nov. 2, 2001. Consequently, at a pre-trial conference held in connection with this matter on April 2, 2002 [46–1], defendant informed the government of its intention to file a foundational challenge to the admissibility of the video and audio recordings, in light of the CI's death.

Thereafter, on April 11, 2002, the government requested a pre-trial hearing on the admissibility of the electronic surveillance tapes, pursuant to Rule 104 of the Federal Rules of Evidence [47–1]. See Fed.R.Evid. 104. The court thus set the matter for an evidentiary hearing on April 16, 2002 [50–1].

### II. The April 16th Hearing

At said hearing, the government offered the testimony of GBI agents Charles D. Butler, Jr. ("Agent Butler"), Kenneth E. Howard ("Agent Howard"), and John A. Cagle ("Agent Cagle"). The testimony of agents Butler and Howard established that each telephone conversation between the CI and defendant was recorded onto a standard audio cassette recorder. Fur-

ther, during each conversation, either Agent Butler or Agent Howard personally monitored both sides of the conversation via a microphone placed in the CI's ear. The microphone transmitted the conversation to one of the agents via an electronic earpiece. Consequently, the agents could personally verify that each recording accurately reflected each telephone conversation.

The GBI testimony also established that prior to each face-to-face meeting between the CI and defendant at defendant's residence, either Agent Butler or Agent Howard conducted a thorough search of the CI's person and his automobile to detect contraband. Next, the agents outfitted the CI with several electronic recording devices. In one of the CI's pockets, the agents placed a Sony MiniDisc Walkman ("MiniDisc recorder"). The agents then attached a wire microphone to the Mini-Disc recorder, fed the microphone through a hole in the CI's pocket, and ultimately secured the microphone inside the CI's pants. In the same fashion, the agents placed a Sony Digital MiniCassette Walkman ("MiniCassette recorder") in the CI's other pocket and clipped a wire microphone inside his pants. Finally, using adhesive tape, the agents attached a "Body Bug," a small black box connected to a wire antenna and a wire microphone, either to the CI's ankle, leg, or under his arm. The agents then secured the microphone and antenna across his chest and back, or up his leg, hidden underneath his clothing.

The antenna connected to the GBI Body Bug transmitted its signal to two sources: (1) a Uniden Bearcat Scanner ("scanner"); and (2) a GBI "repeater." Agents Butler and Howard connected the scanner to a Sony Video Walkman ("video recorder"), which recorded the audio portion of each face-to-face meeting between the CI and defendant onto an 8 millimeter Sony video-

tape. Using the repeater, the agents rebroadcasted the signal from the Body Bug onto separate channels, enabling various agents, including Butler and Howard, to monitor the conversations via standard GBI audio equipment in GBI automobiles and in a GBI surveillance airplane. The GBI airplane circled above defendant's residence during the face-to-face meetings while an agent recorded aerial video footage and monitored the sound from the Body Bug.

Finally, as noted, the agents installed a GBI "bullet camera" inside the grill of the CI's automobile. If the CI's automobile was positioned correctly in defendant's driveway, the bullet camera videotaped each face-to-face meeting, part of which took place directly in front of the CI's car, in between two vehicles in defendant's carport. The video footage from the GBI bullet camera, which was connected to an independent power source placed under the hood of the CI's automobile, was transmitted to the same Sony video recorder and recorded onto the same 8 millimeter videotape that recorded the audio signal from the Body Bug.

Once the CI was properly outfitted with the three electronic surveillance devices, the agents first activated the vehicular bullet camera. The operation, activation, and deactivation of the bullet camera was completely independent from the CI. To deactivate the bullet camera, the CI would have had to manually disrupt its motor or independent power source, which were under the hood of his car. Next, the agents activated the two micro recorders—the MiniDisc recorder and the MiniCassette recorder. Unlike the bullet camera, the GBI could not remotely activate or deactivate these devices. Rather, once activated, the devices simply recorded until stopped. Further, unlike the bullet camera, the CI could have manually deactivat-

ed both devices himself, simply by reaching into his pockets. Finally, the agents activated the Body Bug, and Agent Howard tested all four devices.

At this point, the agents followed the CI's automobile to defendant's residence, electronically monitored each meeting, and then re-convened with the CI at a secure location to deactivate the devices. According to Agent Butler, the agents almost always had the CI in their line of sight during this process. Further, Agent Butler testified that Agent Howard deactivated each device at roughly the same time, rewound the recordings, and then personally reviewed them. By virtue of this synchronized activation and deactivation procedure, the agents were able to produce recordings that were nearly identical in length. Additionally, Agent Howard did not detect any interruptions or deletions in any of the video or audio recordings, he and Agent Butler maintained joint custody of the recordings, and he and Agent Butler jointly submitted said recordings to a GBI–Appalachian Drug Task Force evidence vault.

Given the nearly identical length of each video and audio recording, the agents' close monitoring of each conversation and face-to-face meeting, and the lack of any apparent omissions or interruptions in the recordings, the agents testified that each recording truly and accurately depicted each communication between the CI and defendant. Additionally, by virtue of a MiniDisc feature known as "automatic trackmark insertion,"[1] the agents verified that each recording represented a continuous and uninterrupted audiotaped version of each face-to-face conversation. Cross-referenced with video footage of a nearly identical length, the agents also confirmed that the videotaped recordings were continuous and uninterrupted. Notably, the automatic trackmark insertion feature enabled the agents to cross-check the length of the video recordings despite the absence of any independent time-date generator on the video footage itself.

On the other hand, the agents did not listen to every single audio recording to verify its accuracy. Nor did any human being other than the CI, defendant, and occasionally defendant's wife actually witness the face-to-face meetings as they were being videotaped or hear any of the recorded conversations without the assistance of some type of electronic monitoring equipment.

At some point during the April 16th hearing, defendant expressed his intent to challenge the admissibility of certain post-arrest statements he allegedly made to the GBI. The government lodged no objection, so the court consolidated its hearing on the admissibility of the electronic surveillance evidence with a hearing on the admissibility of defendant's post-arrest statements, pursuant to *Jackson v. Denno*, 378 U.S. 368, 376–77, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). In order to further authenticate the electronic recordings and address any *Jackson v. Denno* concerns, the government thereafter offered the testimony of Agent Cagle.

Agent Cagle testified that he became familiar with defendant's voice through previous encounters with defendant at defendant's Dawson County, Georgia country store. Further, Agent Cagle discussed his

---

1. In connection with the recording of compact discs and MiniDiscs, this feature automatically inserts a new electronic file, or "track," each time a new recording begins. During the music recording process, for example, a song recorded from beginning to end would mark one full electronic track, whereupon a new track would begin with the next song. This feature thus enabled agents Butler and Howard to verify that there were no breaks in the recording process.

role in the GBI's electronic monitoring of defendant's alleged drug·trafficking activities, as well as his presence at defendant's September 2001 arrest. Notably, Agent Cagle relayed that, while electronically monitoring the conversations at issue, he recognized defendant's voice. Finally, Agent Cagle detailed his recollection of defendant's arrest: (1) Agent Cagle advised defendant of his rights by reading from a GBI advice-of-rights card; (2) he asked defendant if he understood those rights; (3) he did not threaten or make any promises to defendant; and (4) he subsequently asked defendant several questions. Defendant, according to Agent Cagle, indicated that he understood his rights, did not ask to speak with an attorney or otherwise invoke his Fifth Amendment rights, and answered Agent Cagle's questions.

On cross-examination, defendant's counsel elicited testimony from Agent Cagle indicating that he had not seen or spoken to defendant in person "for some time," possibly even five years, prior to the underlying investigation. More importantly, however, Agent Cagle testified that despite the overwhelming supply of electronic recording ·equipment at the scene of defendant's arrest, the GBI made no effort to record defendant's post-arrest statements, neither Agent Cagle nor any other GBI agent explicitly asked defendant whether he was willing to waive his *Miranda* rights, and defendant was never asked to review or sign an advice-of-rights waiver form.

## III. Objection to the Admissibility of the Electronic Surveillance Evidence

### a. Standard for the Admissibility of Audio & Video Recordings

The authentication of audio, video, or other electronically recorded evidence is governed by Rule 901(a) of the Federal Rules of Evidence. *See* Fed.R.Evid. 901(a). Rule 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence *sufficient to support a finding* that the matter in question is what its proponent claims." Fed. R.Evid. 901(a) (emphasis added). By way of illustration, Rule 901 indicates that authentication may be achieved by offering the "[t]estimony of [a] witness with knowledge." Fed.R.Evid. 901(b)(1). Other relevant examples include:

(4) Distinctive characteristics and the like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

(5) Voice identification. Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.

(6) Telephone conversations. Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (A) in the case of a person, circumstances, including self-identification, show the person answering to be the one called, or (B) in the case of a business, the call was made to a place of business and the conversation related to business reasonably transacted over the telephone.

Fed.R.Evid. 901(b). Although the government's request for a Rule 104 hearing contends that the admissibility of the underlying electronic recordings is a question for the sound discretion of the trial judge, pursuant to Rule 104(a), this determination is more accurately described as one of conditional relevancy, guided by the strictures of Rule 104(b) [Mot. for Rule 104

Hr'g ¶ 3]. *See* Fed.R.Evid. 104. Rule 104(b) provides:

> (b) Relevancy conditioned on fact. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

Fed.R.Evid. 104(b). The Advisory Committee's Notes to Rule 104(b) elaborate upon the operation of the rule:

> The judge makes a preliminary determination whether the foundation evidence is sufficient to support a finding of fulfillment of the condition. If so, the item is admitted. If after all the evidence on the issue is in, pro and con, the jury could reasonably conclude that fulfillment of the condition is not established, the issue is for them. If the evidence is not such as to allow a finding, the judge withdraws the matter from their consideration.

Fed.R.Evid. 104, Advisory Committee's Notes. Likewise, the Advisory Committee's Notes to Rule 901 indicate that "[a]uthentication and identification ... fall[ ] in the category of relevancy dependent upon fulfillment of a condition of fact and [are] governed by the procedure set forth in Rule 104(b) ...." Fed.R.Evid. 901, Advisory Committee Notes.

■ Rules 901(a) and 104(b) thus provide a framework for preliminary admissibility. The trial judge may conditionally admit the evidence "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification," even though the authenticity of a recording is ultimately a factual determination for the jury to decide. 5 Weinstein & Berger, Weinstein's Evidence § 901(a)[01] at 901–17 (1982).

■ To determine whether the proponent of electronic surveillance evidence has introduced evidence of its genuineness "sufficient to support a finding" of authenticity by the jury, within the meaning of Rules 901(a) and 104(b), the United States Court of Appeals for the Eleventh Circuit appears to have adopted a flexible inquiry. The Eleventh Circuit standard, initially set forth by the former Fifth Circuit in *United States v. Biggins*, 551 F.2d 64, 66 (5th Cir.1977),[2] requires the proponent to show, in a criminal case: "(1) the competency of the operator [of the recording equipment]; (2) the fidelity of the recording equipment; (3) the absence of material deletions, additions, or alterations in the relevant part of the tape; and (4) the identification of the relevant speakers." *United States v. Sarro*, 742 F.2d 1286, 1292 (11th Cir.1984) (citing *Biggins*, 551 F.2d at 66).

■ As noted, however, the Eleventh Circuit has made it clear that this "*Biggins* foundation" is not a rigid formula for admission; the trial judge has "broad discretion in determining whether to allow a recording to be played before the jury." *Id.* Further, "if the trial judge independently determines that the recording accurately reproduces the auditory evidence ... his discretion to admit the evidence is not to be sacrificed to a formalistic adherence to the [*Biggins*] standard ...." *Biggins*, 551 F.2d at 67. Thus, the presentation of "independent evidence of the accuracy of the ... recordings admitted at trial," or circumstantial proof of reliability, can satisfy *Biggins*. *Id.* For example, the Eleventh Circuit has approved of a variety of approaches to showing the fourth element of the *Biggins* test (identification of the relevant speaker) where the proponent is unable to call a witness

---

**2.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

who actually participated in the electronically recorded conversation. Specifically, a speaker featured on an electronic recording may be identified via: "self-identification of each [speaker] on at least one occasion during the intercepted ... conversations, identification through nicknames, surveillance, telephone subscriber information, and the monitoring agents' use of working copies of the known voice samples to become familiar with each [speaker's] voice." *United States v. Green*, 40 F.3d 1167, 1173 (11th Cir.1994).

### b. Discussion & Analysis

■ At the conclusion of the April 16th hearing, defendant reiterated that the government's inability to produce testimony from a witness who actually observed the face-to-face meetings as they were occurring, or who personally listened to the telephone conversations without the assistance of an electronic device, vitiated the government's effort to authenticate the audio and video recordings. At a bare minimum, defendant contended, *Biggins* requires the proponent of a surveillance videotape to verify that the videotape accurately reflects the movements of the targeted persons, the lighting of the "scene," and the content of the interactions depicted therein.

■ As a preliminary matter, the court notes that it has long been the rule in the federal courts, even before the 1975 adoption of the Federal Rules of Evidence, that the authentication of a photograph or motion picture does not require testimony from the person who actually operated the camera. *See, e.g., Kortz v. Guardian Life Ins. Co.*, 144 F.2d 676, 679 (10th Cir.1944), *cert. denied*, 323 U.S. 728, 65 S.Ct. 63, 89 L.Ed. 584; *Boyle v. Ward*, 39 F.Supp. 545, 548–49 (M.D.Pa.1941), *aff'd*, 125 F.2d 672 (3d Cir.1942); *New York, S. & W.R. Co. v. Moore*, 105 F. 725, 728 (2d Cir.1901). Further, more recent federal decisions indicate that recordings made by surveillance equipment that operates automatically, such that no human being actually witnessed what the camera recorded while the camera was recording it, may satisfy the requirements of the Federal Rules of Evidence so long as a witness testifies as to the type of equipment or camera used, its general reliability, the quality of the recorded product, the process by which it was focused, or the general reliability of the entire system. *See United States v. Taylor*, 530 F.2d 639, 641–42 (5th Cir. 1976); *United States v. Rivera–Maldonado*, 194 F.3d 224, 237 (1st Cir.1999); *United States v. Sivils*, 960 F.2d 587, 597 (6th Cir.1992); *United States v. Rembert*, 863 F.2d 1023, 1028 (D.C.Cir.1988).

In *United States v. Taylor*, 530 F.2d 639 (5th Cir.1976), for example, the United States Court of Appeals for the Fifth Circuit affirmed the trial court's authenticity determination in a bank robbery prosecution even though the "contact prints" at issue, taken by a bank camera after all of the potential bank robbery witnesses were locked in a vault, could not be independently verified by any of the "victim witnesses" present at the scene of the crime. *Taylor*, 530 F.2d at 641–42. Instead, government witnesses not present at the crime scene testified generally as to the installation of the film, the operation of the camera, and the chain of custody. *See id.*

Likewise, the United States Court of Appeals for the D.C. Circuit determined, in *United States v. Rembert*, 863 F.2d 1023 (D.C.Cir.1988), that a series of surveillance photographs taken by a closed-circuit video camera at an automatic teller machine ("ATM") were properly authenticated for purposes of an armed robbery trial, despite the inability of the government to offer a witness who could personally verify that "the photographs fairly and accurately depicted the scene and events at [the]

time" of the crime. *Rembert*, 863 F.2d at 1028–1029. Rather, as in *Taylor*, the government introduced foundational testimony from a bank employee concerning the operation of the surveillance cameras, the loading of film, and the chain of custody. *See id.* at 1028. Notably, although the photographs at issue in *Rembert* contained an internal date-time generator, the photographs were only taken every three seconds, by a succession of cameras, each shooting from a different view. *See id.* at 1026.

The court recognizes that unprecedented technological advances over the last twenty years have dramatically increased the ease with which electronic recordings may be altered to suit the proponent's objectives. Yet, these same advances have also greatly improved our ability to detect and expose such electronic tampering. In this case, the government has presented the most careful and comprehensive foundational authentication evidence that this jurist has ever seen. The government has, in fact, introduced evidence of reliability well beyond what is "sufficient to support a finding" of authenticity by the jury, pursuant to Rule 104(b). Fed.R.Evid. 104(b).

As to the challenged audiotaped recordings, the testimony of GBI agents Butler, Howard, and Cagle easily establishes "(1) the competency of the operator [of the recording equipment]; (2) the fidelity of the recording equipment; (3) the absence of material deletions, additions, or alterations in the relevant part of the tape; and (4) the identification of the relevant speakers." *Sarro*, 742 F.2d at 1292. Agents Butler and Howard testified as to their extensive training, experience, and skill in the installation and operation of electronic surveillance equipment. The audiotapes generated from the MiniDisc recorder, the MiniCassette recorder, and the Body Bug each serve to corroborate the other, attesting to the accuracy of the recordings and the fidelity of the surveillance equipment. Further, the reliability of these recordings, each of which is of a nearly identical length, may be independently verified by reference to the MiniDisc recorder's automatic trackmark insertion—virtually uncontroverted evidence of the absence of any material deletions, additions, or alterations. Finally, Agent Cagle personally identified defendant's voice on the recordings.

This authentication evidence applies with equal force to the challenged surveillance videotapes. Although, as defendant notes, the videotapes contain "no counter in the corner of the picture that displays the time and date," *United States v. Payton*, 92 F.3d 1195, 1996 WL 429133, *3 (9th Cir.1996), their comparison to the independently authenticated MiniDisc recordings, which do in fact contain such a counter, cures this potential defect. Further, this corroborating circumstantial evidence of reliability, combined with the multiple methods of surveillance employed by the GBI, makes the government's showing even stronger than it might have been if the CI, a government informant, was available to testify. For that matter, the video footage at issue in this case is far more reliable than that approved by the Fifth Circuit in *Taylor* or the D.C. Circuit in *Rembert*, where surveillance photographs were taken only sporadically. *See Rembert*, 863 F.2d at 1028–29; *Taylor*, 530 F.2d at 641–42. The jury may of course decide otherwise, yet the court is confident that, at a bare minimum, these videotapes accurately portray what the eye of the camera was seeing during the relevant time periods.

**IV. Objection to the Admissibility of Defendant's Post–Arrest Statements**

■ The *Jackson v. Denno*, 378 U.S. 368, 376–77, 84 S.Ct. 1774, 12 L.Ed.2d 908

(1964), inquiry which followed the hearing on the admissibility of the audio and video surveillance tapes revealed that although Agent Cagle advised defendant of his rights and asked defendant whether he understood those rights before questioning him, neither Agent Cagle nor any other GBI agent obtained an explicit advice-of-rights waiver from defendant. Nevertheless, in the absence of evidence suggesting that defendant's post-arrest statements to the GBI were involuntary, no explicit advice-of-rights waiver is required. *See North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) (holding that "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver."); *Sullivan v. State of Ala.*, 666 F.2d 478, 483 (11th Cir.1982) (opining that although waiver of *Miranda* rights cannot be presumed from a silent record, waiver need not be explicit and can be inferred from totality of the circumstances). *See also United States v. Mills*, 122 F.3d 346 (7th Cir.1997); *United States v. Andaverde*, 64 F.3d 1305 (9th Cir.1995); *United States v. Calise*, 996 F.2d 1019 (9th Cir.1993); *United States v. Matsushita*, 794 F.2d 46 (2d Cir.1986); *United States v. Dorsey*, 591 F.2d 922 (D.C.Cir.1978).

## V. Conclusion

For the foregoing reasons, this court concludes that (1) the government's audio and video surveillance tapes; and (2) defendant's post-arrest statements satisfy the conditions for admissibility under the Federal Rules of Evidence. This opinion is meant to memorialize such ruling as it was made in open court on April 16, 2002.