961 A.2d 1110 (2008)
406 Md. 642
Rory Howard WASHINGTON
v.
STATE of Maryland.
No. 31, September Term, 2008.
Court of Appeals of Maryland.
December 12, 2008.
*1111 Allison Pierce Brasseaux, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore) on the brief, for Petitioner/Cross-Respondent.
Edward J. Kelley, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., Baltimore) on brief, for Respondent/Cross-Petitioner.
Argued Before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, JOHN C. ELDRIDGE, (Retired, specially assigned), and IRMA S. RAKER, (Retired, specially assigned), JJ.
IRMA S. RAKER, Judge, (Retired, specially assigned).
In this criminal case, we address the requirements of an adequate evidentiary foundation for the admission of a surveillance videotape. We shall reverse because the trial court erred in admitting the tape without an adequate foundation, and the error was not harmless beyond a reasonable doubt.

I.
Rory Washington was indicted by the Grand Jury for Baltimore City for the offenses of attempted murder in the first degree, attempted murder in the second degree, assault in the first degree, assault in the second degree, and three handgun violations. A jury found him guilty of assault in the first degree, assault in the second degree, and the three handgun violations. The jury acquitted him of attempted first degree murder and deadlocked on the attempted second degree murder charge.[1] The court sentenced him to a term of incarceration of twenty years on the first degree assault charge and fifteen years for use of a handgun in the commission of a crime of violence, three years for illegally carrying a handgun, and five years for possession of a regulated firearm, to be served concurrent with the twenty-year sentence for assault.
The following facts were elicited during the trial. During the evening of June 23, 2005, Jermaine Wright went to Jerry's Bar, a bar and liquor store located at 604 Poplar Grove Street in Baltimore City. *1112 Wright and petitioner, Washington, got into an argument, Washington left the bar, then returned about ten minutes later and asked Wright to step outside. At approximately 10:00 p.m., Wright, unarmed, followed him outside and was shot in the stomach. A bullet lodged in his spinal cord, resulting in an L3 spinal cord injury. Police arrived on the scene and found narcotics on Wright's person and recovered a pink hat belonging to Wright. The police questioned Wright on the night of the shooting, and Wright said that he did not know who shot him and that he did not see the weapon. He described his assailant as a black male, with thick build, wearing a white t-shirt. When shown photographic arrays containing photos of petitioner, Wright either refused to view the array or said that he needed additional time.
Petitioner was arrested and indicted for the shooting. At trial, Wright identified petitioner as the person who shot him. He testified that he knew petitioner for three years. He acknowledged that initially he "hadn't told the police nothing," and explained that the reason he did not identify Washington as the shooter was that he wanted to handle it himself. He testified as follows:
"Because I wantedI wanted him to still be out there because, you know, I was going to take advantage of myself. I was going to get him.... I was so mad and angry I wantedyou know, I was going to deal with it myself."
The State introduced into evidence a videotape recording made by surveillance cameras inside and outside the bar. According to the owner of the bar, David Kim, the camera system was an eight-camera digital video security system, with six cameras inside and two cameras outside the bar, that recorded "24 hours a day." Mr. Kim testified that the police called him after the incident on June 23, 2005 and requested to see the surveillance tapes. Kim said that a technician came out the next day to "print" a CD with surveillance footage that Kim turned over to the police. The CD had been compiled from the various cameras and was transferred to a VHS tape.[2]
Detective Carlos Vila testified that he received a copy of the tape, and after watching it, developed a suspect. Defense counsel objected to the admissibility of the tape, arguing lack of foundation to establish authenticity of the original CD-ROM, stating as follows:
"I don't think it'sthere's enough for a business record. And what Mr. Kim the only thing Mr. Kim said it was computer generated and based on Detective Vila's testimony we have an unknown person who actually did the copying. Apparently Mr. Kim does not know how to do that. The copying ofthe copying from the system onto the CD-ROM or CDa DVR or whatever. So I think there's a hole that's not filled."
The State argued that even if the tape was not authenticated under the business records exception, it was authenticated under the "silent witness" rule, based upon Kim's testimony. The court overruled the objection and admitted the tape into evidence.
The State played the tape before the jury, pausing it and asking Detective Vila questions about what he could see on the tape. The State showed Detective Vila actual still photographs of the video footage and asked him to describe each of the photographs and identify anything of significance in them. Defense counsel objected *1113 to Detective Vila's testimony, arguing that by describing his observations of the still photographs, Detective Vila implicitly identified petitioner as one of the individuals pictured in the photographs. The court overruled the objection. Detective Vila testified that the tape depicted several individuals sitting at the bar and explained that one of the individuals wore blue jeans and a t-shirt with a rag or t-shirt on his head. He testified that another photograph depicted the same individual wearing a white t-shirt, a bandana or t-shirt on his head, and a watch on his left wrist. A later photograph depicted the same individual, but without the head gear. Finally, he testified that a photograph showed an individual in a pink hat falling to the ground and the individual wearing a white t-shirt and blue jeans at a distance.
The State called several witnesses who had been at the bar on the evening of the shooting. Some of those witnesses proved challenging to the State and were not particularly cooperative. Charles Burrell, an employee of the bar, testified that on the night of the shooting he broke up a fight between Wright and another patron of the bar. Afterward, Burrell went to the corner to pick up some food and, while he was gone, he heard a shot ring out. He returned to the bar and saw Wright laying injured on the ground. Burrell testified that petitioner usually wore a white t-shirt or towel on his head. Although the State called Burrell as a witness, based apparently on a statement he gave to the police the night of the shooting stating that he saw petitioner in the bar, Burrell insisted that he did not see petitioner in the bar on the night of the shooting.
Gregory Jennings, a person who helped out at the bar, testified that the night of the shooting, he observed Wright in an argument with several other bar patrons, including petitioner. Jennings followed petitioner and Wright outside the bar where he observed the two continue their argument, but then Jennings returned inside the bar. Jennings went to the police station on the night of the shooting, and after viewing photographs, he identified petitioner as the man who had been arguing with Wright. He conceded that he had signed a photograph of petitioner at the police station the night of the shooting and made a taped statement to the police that he had witnessed petitioner and Wright arguing, but testified at trial that the police had told him what to say in his taped statement and refused to let him leave the station until he complied. Jennings also testified at trial that petitioner always wore a towel or t-shirt around his head.
The defense theory of the case was twofold: first, that petitioner was not the person who shot Wright and, alternatively, that if the jury were to find that petitioner was the shooter, that there was a mutual affray and that petitioner acted in self-defense. The defense presented no evidence, but argued that petitioner was not the shooter.
During jury deliberations, the jury requested to view the videotape, and the court, after agreement from the State and defense counsel, sent a TV/VCR combination unit into the jury room. As indicated, the jury convicted petitioner of assault and the three handgun violations.
Petitioner noted a timely appeal to the Court of Special Appeals. The Court of Special Appeals affirmed, holding that the trial court abused its discretion in admitting the videotape and still photographs into evidence, but that the error was harmless. Washington v. State, 179 Md.App. 32, 943 A.2d 704 (2008).
We granted certiorari to consider the following questions:
(1) Did the trial court abuse its discretion when, in violation of Rule 5-701, it *1114 permitted the investigating detective, who did not know the petitioner and who did not witness the shooting, to opine that the person shown in a surveillance videotape and photographs over an hour before the shooting was the same person shown in the videotape and photographs at the time of the shooting, when such testimony amounted to an implicit identification of the petitioner as the shooter?
(2) Was the investigating detective's testimony about the surveillance videotape and photographs harmless beyond a reasonable doubt?
(3) Did the Court of Special Appeals err when it held that the introduction of an improperly authenticated surveillance videotape and photographs was harmless error, where the videotape and the photographs purportedly placed the petitioner at the scene of the crime, where they purportedly showed the petitioner committing the crime and where the prosecutor, in opening and closing arguments, repeatedly referred to, and relied on, those exhibits to argue that the petitioner was not guilty?
Washington v. State, 405 Md. 63, 949 A.2d 652 (2008).[3]

II.
The determinative issue in this case is whether the introduction of the surveillance videotapes and photographs was harmless error. Petitioner argues that the Court of Special Appeals erred in holding that the introduction of the improperly authenticated surveillance videotape was harmless error. He argues that because the intermediate appellate court held that "[b]ecause the error probably did not affect the jury's verdict, a reversal is not warranted," the court used the wrong standard for assessing harmless error. The Court of Special Appeals, in ruling on the harmless error issue, stated as follows:
"Upon our independent review of the record, we can affirmatively say beyond a reasonable doubt that the trial court's error in admitting the videotape and still photographs without proper authentication did not in any way influence appellant's verdict. Lawson v. State, 389 Md. 570, 581, 886 A.2d 876 (2005). The videotape and still photographs added to or illustrated the testimony of Wright, Burrell and Jennings and, thus, in our view, the jury would have found appellant guilty without reliance on the improperly admitted evidence. Because the error `probably' did not affect the jury's verdict, a reversal is not warranted. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (Non-constitutional errors require reversal only when the error `substantially' or `probably' affected the jury's verdict and, thus, to put it another way, only when there is no probability that the jury's verdict would have been different is the error harmless)."
Washington, supra, 179 Md.App. at 54-55, 943 A.2d at 717. While the intermediate appellate court cited Strickland and the "probability" standard, the court made clear that in Maryland, the standard for review as to whether an error is harmless, is beyond a reasonable doubt, and not a probability or preponderance standard.
Petitioner argues, on the merits, that the error was not harmless beyond a reasonable doubt. We agree with petitioner and hold that under the circumstances presented herein, the admission of the videotape *1115 without proper authentication was not harmless error.[4]
The Court of Special Appeals held that the State failed to lay an adequate foundation assuring the accuracy of the process that produced the videotape and therefore, the trial court abused its discretion in permitting the videotape into evidence. Id. at 51-52, 943 A.2d at 715. The court reasoned as follows:
"Because of the lack of extrinsic evidence showing under what circumstances the surveillance footage was transferred to a compact disc, the trier of fact could not reasonably infer that the subject matter is what the State claims it to be and, thus, the videotape was not sufficiently authenticated."
Id. at 52, 943 A.2d at 716.
Maryland Rule 5-901(a), identical to the Federal Rule of Evidence 901(a), governs the authentication of evidence in both civil and criminal trials. Md. Rule 5-901(a) provides as follows:
"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."
In order to satisfy the evidentiary requirement for authentication, the proponent of the evidence must show that the evidence is "sufficient to support a finding that the matter in question is what its proponent claims." Md. Rule 5-901(a).
A videotape is considered a photograph for admissibility purposes. It is admissible in evidence and is subject to the same general rules of admissibility as a photograph. Dep't of Public Safety v. Cole, 342 Md. 12, 20, 672 A.2d 1115, 1119 (1996). Photographic manipulation, alterations and fabrications are nothing new, nor are such changes unique to digital imaging, although it might be easier in this digital age. As noted by Professor Lynn McLain, "[m]ovies and tapes are easily manipulated, through such means as editing and changes of speed, to produce a misleading effect." 5 LYNN MCLAIN, MARYLAND EVIDENCE § 403.6 at 592 (2001). Courts therefore require authentication of photographs, movies, or videotapes as a preliminary fact determination, requiring the presentation of evidence sufficient to show that the evidence sought to be admitted is genuine.
The Court of Special Appeals set out the rules for admission of photographs, succinctly stating as follows:
"Photographs may be admissible under one of two distinct rules. Typically, photographs are admissible to illustrate testimony of a witness when that witness testifies from first-hand knowledge that the photograph fairly and accurately represents the scene or object it purports to depict as it existed at the relevant time. There is a second, alternative method of authenticating photographs that does not require first-hand knowledge. The `silent witness' theory of admissibility authenticates `a photograph as a `mute' or `silent' independent photographic witness because the photograph speaks with its own probative effect.'"
*1116 Washington, supra, 179 Md.App. at 44, 943 A.2d at 711 (citations omitted). Thus, the pictorial testimony theory of authentication allows photographic evidence to be authenticated through the testimony of a witness with personal knowledge, and the silent witness method of authentication allows for authentication by the presentation of evidence describing a process or system that produces an accurate result. Cole, supra, 342 Md. at 20-22, 672 A.2d at 1119; In re Welfare of S.A.M., 570 N.W.2d 162, 164-65 (Minn.Ct.App.1997).
Photographs may be admissible as probative evidence in themselves rather than merely as illustrative evidence to support a witness's testimony, so long as sufficient foundational evidence is presented to show the circumstances under which it was taken and the reliability of the reproduction process. See People v. Bowley, 59 Cal.2d 855, 31 Cal.Rptr. 471, 382 P.2d 591, 594 (1963). Professor Wigmore explained the theory of the silent witness authentication as follows:
"With later advancements in the art of photography ... and with increasing awareness of the manifold evidentiary uses of the products of the art, it has become clear that an additional theory of admissibility of photographs is entitled to recognition. Thus, even though no human is capable of swearing that he personally perceived what a photograph purports to portray (so that it is not possible to satisfy the requirements of the `pictorial testimony' rationale) there may nevertheless be good warrant for receiving the photograph in evidence. Given an adequate foundation assuring the accuracy of the process producing it, the photograph should then be received as a so-called silent witness or as a witness which `speaks for itself.'"
3 WIGMORE ON EVIDENCE § 790 at 219-220 (Chadbourn rev., Little, Brown & Co.1970). Generally, surveillance tapes are authenticated under the silent witness theory, and without an attesting witness. See Victor E. Bianchini & Harvey Bass, Perspectives: A Paradigm for the Authentication of Photographic Evidence in the Digital Age, 20 T. JEFFERSON L.REV. 303, 320 (1998).
Authentication of a photograph does not require testimony of the person who took the photograph. See State v. Broberg, 342 Md. 544, 553, n. 5, 677 A.2d 602, 606 n. 5 (1996); Vogelsang v. Sehlhorst, 194 Md. 413, 421, 71 A.2d 295, 299 (1950). See also Kortz v. Guardian Life Ins. Co. of America, 144 F.2d 676, 679 (10th Cir.1944), cert. denied, 323 U.S. 728, 65 S.Ct. 63, 89 L.Ed. 584 (1944). Courts have admitted surveillance tapes and photographs made by surveillance equipment that operates automatically when "a witness testifies to the type of equipment or camera used, its general reliability, the quality of the recorded product, the process by which it was focused, or the general reliability of the entire system." United States v. Stephens, 202 F.Supp.2d 1361, 1368 (N.D.Ga.2002) (citing United States v. Rivera-Maldonado, 194 F.3d 224, 237 (1st Cir.1999); United States v. Sivils, 960 F.2d 587, 597 (6th Cir.1992); United States v. Rembert, 863 F.2d 1023, 1028 (D.C.Cir. 1988); United States v. Taylor, 530 F.2d 639, 641-42 (5th Cir.1976)).
Taylor involved the prosecution of an armed robbery of a federally-insured state bank. Taylor, supra, 530 F.2d at 640. A bank camera, tripped after the bank employees were locked in the vault, took photographs of the robbers, and contact prints made from the film were introduced into evidence by the Government. The United States Court of Appeals for the Fifth Circuit affirmed the trial court's determination of authenticity. The court stated as follows:

*1117 "In the case before us it was, of course, impossible for any of the tellers to testify that the film accurately depicted the events as witnessed by them, since the camera was activated only after the bank personnel were locked in the vault. The only testimony offered as foundation for the introduction of the photographs was by government witnesses who were not present during the actual robbery. These witnesses, however, testified as to the manner in which the film was installed in the camera, how the camera was activated, the fact that the film was removed immediately after the robbery, the chain of its possession, and the fact that it was properly developed and contact prints made from it. Under the circumstances of this case, we find that such testimony furnished sufficient authentication for the admission of the contact prints into evidence."
Id. at 641-42.
In Commonwealth v. Leneski, 66 Mass. App.Ct. 291, 846 N.E.2d 1195 (2006), the court upheld the admissibility of images produced by a store surveillance camera. The surveillance system consisted of motion sensitive cameras connected to a computer; the cameras were activated by motion and the captured images recorded on the computer's hard drive. The owner of the store testified at trial that he transferred pertinent parts of the images to a CD which was received into evidence at trial. The intermediate appellate court held as follows:
"Here, the CD was properly authenticated by [the store owner], who viewed the images on the computer and `burned' the CD copy; he testified as to the procedure he used in the surveillance process, the copying process, and to the contents of the CD. This testimony was sufficient to authenticate the CD, and to render it admissible as evidence. Any concerns that the defendant had regarding the surveillance procedures, and the method of storing and reproducing the video material, `were properly the subject of cross-examination and affected the weight, not the admissibility, of the' CD."
Id. at 1199.
In the instant case, the State offered the videotape and still photographs as probative evidence in themselves, and not as illustrative evidence to support the testimony of an eye-witness. The evidence was offered by the State to demonstrate that petitioner was present at Jerry's Bar on the night of the crime. Here, the foundational requirement is more than that required for a simple videotape. The videotape recording, made from eight surveillance cameras, was created by some unknown person, who through some unknown process, compiled images from the various cameras to a CD, and then to a videotape. There was no testimony as to the process used, the manner of operation of the cameras, the reliability or authenticity of the images, or the chain of custody of the pictures. The State did not lay an adequate foundation to enable the court to find that the videotape and photographs reliably depicted the events leading up to the shooting and its aftermath. Without suggesting that manipulation or distortion occurred in this case, we reiterate that it is the proponent's burden to establish that the videotape and photographs represent what they purport to portray. The State did not do so here.
Mr. Kim, the owner of the bar, testified that he did not know how to transfer the data from the surveillance system to portable discs. He hired a technician to transfer the footage from the eight cameras onto one disc in a single viewable format. Mr. Kim did not testify as to the subsequent editing process and testified only *1118 that the surveillance cameras operated "almost hands-free" and recorded constantly. Detective Vila's testimony also failed to authenticate the video. He testified that he saw the footage only after it had been edited by the technician. We hold that the trial court erred in admitting the videotape and still photographs without first requiring an adequate foundation to support a finding that the matter in question is what the State claimed it to be.
We consider whether the improper admission of the surveillance video and photographs constituted harmless error. The standard in Maryland for evaluating harmless error was set forth by this Court in Dorsey
"[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed `harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained ofwhether erroneously admitted or excludedmay have contributed to the rendition of the guilty verdict."
Dorsey v. State, 276 Md. 638, 659, 350 A.2d 665, 678 (1976). The standard remains unchanged today. See Lee v. State, 405 Md. 148, 174, 950 A.2d 125, 140 (2008); State v. Baby, 404 Md. 220, 265, 946 A.2d 463, 489 (2008); Bellamy v. State, 403 Md. 308, 332, 941 A.2d 1107, 1121 (2008); State v. Logan, 394 Md. 378, 388, 906 A.2d 374, 380 (2006); Clemons v. State, 392 Md. 339, 372, 896 A.2d 1059, 1078-79 (2006).
The State relied heavily on the videotape to establish its case. The State used the videotape to counter petitioner's argument that he was not the shooter, as well as to negate any mutual affray defense. The State referred to the videotape in its opening statement to the jury, highlighting the tape's importance. The prosecutor said as follows:
"Once the police learn this information they were able to identify from the owner of Jerry's Bar a disk if you will, a surveillance tape if you will. Upon looking at the surveillance tape the Defendant became or was developed as a suspect. You will be able to see the surveillance tape that police officers recovered from Jerry's Bar.
* * *
"Now, once you look at the tape it's clear you will be the judges of fact.... And based upon the testimony you receive here and based upon your own observations it will be clear ...
* * *
"Once you look at the tape you'll be able to see. Look closely. Look at the Defendant, look at the video tape and make the determination as to whether the shooter and the Defendant is one in the same."
In her closing argument, the prosecutor underscored the critical importance of the video to the State's case:
"Was this an accident? I assure you you saw the tape as well as I did. The Defendant didn't trip and shoot the victim.
* * *
"For the answer to that question you can look at the tape or you can look at State's Exhibit 2A in evidence. 2A shows that on the date in question at 2152 and 20 seconds the Defendant is standing there waiving the victim outside. You have the tape. You have the photograph.

*1119 * * *
"If you question whether he had time, when you look at the tape, just look at the timer from the time he leaves until the time he returns.
* * *
"Now you've heard from those three witnesses, but you heard from a fourth witness who spoke louder than anyone else. I call it the silent witness, that tape. If a picture speaks 1,000 words, than that tape will get you to the just ending in this case."
The prosecutor also highlighted the importance of the video in her rebuttal argument:
"Now you've heard time and time again the tape is the best evidence. And I'm going to tell you, that's absolutely true."
Without the videotape, the State's identification of petitioner as the shooter would have rested primarily on the testimony of Mr. Wright, a witness who had declined on several occasions pretrial to identify petitioner as the shooter. Although it was a jury determination as to the credibility of Mr. Wright's explanation for why he did not identify petitioner as the shooter before the trial, the videotape, relied upon so heavily by the State, under these circumstances, was not harmless beyond a reasonable doubt.
JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.
NOTES
[1] The State entered a nolle prosequi to the attempted second degree murder charge.
[2] The parties stipulated at trial that the information on the CD was transferred to the VHS tape. Petitioner's objection was related to the transfer of the information from the cameras to the CD.
[3] Because we shall reverse the judgment of the Court of Special Appeals on the third question presented in the petition for certiorari, we do not address questions one or two.
[4] We note Justice Traynor's observation of harmless error set out in Foreword, The Riddle of Harmless Error (Ohio St. U. Press 1969):

"Errors are the insects in the world of law, traveling through it in swarms, often unnoticed in their endless procession. Many are plainly harmless; some appear ominously harmful. Some, for all the benign appearance of their spindly traces, mark the way for a plague of followers that deplete trials of fairness."
Jon B. Eisenberg, Twelve Prose Poems by Roger J. Traynor (with a Nod to Charles Baudelaire), 9 J.APP. PRAC. & PROCESS 245, 247 (2007).