# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *People v. Taylor*, 2011 IL 110067

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. TERYCK TAYLOR, Appellee. |
| Docket No. | 110067 |
| Filed | October 6, 2011 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | When a videotape which contained a recognizable image of defendant night watchman stealing from a locked office desk and which had been copied from the hard drive of a video recorder that was connected to a motion-activated surveillance camera met the foundation requirements, under the "silent witness" theory, for establishing the accuracy and reliability of the process that produced the recording and met the definition of an "original" so as not to be subject to the best evidence rule–no abuse of discretion in admission and no plain error. |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of Lake County, the Hon. Michael J. Fusz, the Hon. Susan F. Hutchinson, the Hon. Ann B. Jorgensen and the Hon. Mary Seminara-Schostok, Judges, presiding. |
| Judgment | Appellate court judgment reversed;<br>circuit court judgment affirmed. |

| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield, and Michael J. Waller, State's Attorney, of Waukegan (Michael A. Scodro, Solicitor General, and Michael M. Glick and Retha Stotts, Assistant Attorneys General, of Chicago, and Patrick Delfino, Lawrence M. Bauer, Marshall M. Stevens and Richard S. London, of the Office of the State's Attorneys Appellate Prosecutor, of Elgin, of counsel), for the People. |

Michael J. Pelletier, State Appellate Defender, Thomas A. Lilien, Deputy Defender, and Jack Hildebrand, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Elgin, for appellee.

Michael D. Carter, of Horwitz, Horwitz & Associates, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

| Justices | JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Freeman, Thomas, Garman, Karmeier, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1    The principal issue presented in this case is whether under the so-called "silent witness" theory, a videotape recording was properly admitted at defendant's trial. The appellate court held that it was not and reversed defendant's conviction for misdemeanor theft. 398 Ill. App. 3d 74. For the reasons that follow, we reverse the judgment of the appellate court.

¶ 2                                  BACKGROUND

¶ 3    In 2005, several thefts occurred at the office of Kevin Marsh, dean of students at Deerfield High School in Deerfield, Illinois. Marsh had been collecting money for a fundraiser. He had placed the money in a bank pouch and then put the pouch in his office desk. Money disappeared several times from the pouch over weekends when Marsh's office door had been locked.

¶ 4    Following the thefts, Detective William Annen of the Deerfield police department met with Marsh and suggested they set up a surveillance camera in Marsh's office. On Friday, December 1, 2005, Annen set up the equipment, which consisted of a motion activated, wireless, digital camera concealed within a clock radio and a digital video recorder (DVR). Annen had only recently begun using such equipment. He testified that an employee at the store where he purchased the equipment had shown him how to set it up and use it. Annen further stated he read the instructions that came with the equipment. Annen explained how

-2-

the equipment worked:

> "Simply *** plug in the camera which was inside of a clock radio, a working clock radio, that plugs into a power source. You aim that camera wherever you want to observe. That camera sends a signal to the wireless transmitter which is connected to the DVR which is a digital video recorder, just like a computer drive and that records the images that the camera sees."

Annen testified that he placed the clock radio on Marsh's desk, in front of the drawer from which the money had been taken. Annen tested the equipment by turning everything on and making sure there was a good picture coming from the camera. Annen stated that when any moving object came into the viewing area of the camera, the recording process would start.

¶ 5    On Monday, Annen returned to Marsh's office and checked the equipment. He found that the motion sensor had triggered the DVR and a recording had been made. However, the images on the recording were not visible due to insufficient light.

¶ 6    On Friday, December 9, Annen set up the equipment again and placed a small lamp on Marsh's desk. He left a note next to the lamp requesting that it be left on.

¶ 7    On Monday, December 12, Annen returned to Marsh's office after Marsh advised him $20 was missing from the pouch. At this time, the DVR, transmitter and camera were all still on. Again, the DVR had been triggered. Annen, along with Marsh and Paul Mocogni, the school's facility manager, viewed the DVR recording. Marsh and Mocogni identified defendant, Teryck Taylor, as the individual in the recording. Defendant worked at the school as a night watchman.

¶ 8    On December 16, Mocogni, Sue Hebson, the school's principal, and Barry Bolek, the school's assistant superintendent, met with defendant. During the interview, defendant admitted to stealing cash from Marsh's office on December 10. However, defendant stated it was only $10. Defendant also admitted to taking cash on three to four other occasions.

¶ 9    According to a Deerfield police report summary, authored by Annen, on December 16, Annen "made a copy of the video surveillance on the hard drive, specifically the segment where Taylor was in Marsh's office[,] onto a VHS tape." Annen removed the tape's recording tab, and locked the VHS tape in his desk, "to be later locked in an evidence locker." The report further stated that Annen viewed all the footage recorded by the DVR from December 9 to December 12 and that no one other than defendant went into Marsh's office.

¶ 10   Annen interviewed defendant on January 4, 2006. During this interview, according to Annen, defendant admitted to stealing money from Marsh's desk on December 10.

¶ 11   Prior to trial, defendant filed a motion *in limine* to bar the State from using the VHS tape at trial, arguing that the State would be unable to lay a foundation for the VHS tape because it contained a 30-second skip. The trial court denied this motion, but the record does not include the reason for the denial.

¶ 12   When the State sought to admit the VHS tape at trial, defendant objected on foundational grounds, arguing that the video skips forward 30 seconds and the State failed to explain why the gap existed. Defense counsel also argued that it had not been shown that the camera was

working properly. The trial court advised the State to lay a better foundation. Annen then testified the camera was still working on December 12 as it had been on December 9. Defense counsel again objected, stating there were five elements for admission: "capability of the device [for] recording, competency of the operator, proper operation of the device, preservation of recording with no changes, additions or deletions and identification of the speakers." Defense counsel took issue with the competency of Annen, since he was not present when the device recorded, and with the absence of proof that the motion sensor was operating properly. The trial court again advised the State to lay more foundation.

¶ 13    Annen then testified that, on December 9, he plugged a portable 13-inch monitor into the feed from the DVR to determine if the devices were working properly. This allowed him to see what the camera was seeing. As the camera was on Marsh's desk, Annen had Marsh walk in front of the camera to check that the motion sensor was working. When Marsh walked in front of the camera, the DVR turned on. According to Annen, this showed that the connection was working. At this point, Annen assumed the DVR was recording. When Annen returned to Marsh's office on December 12, he again plugged his monitor into the DVR. Annen saw a live feed of Marsh's desk. Everything was still on and working properly.

¶ 14    Defense counsel again objected, arguing there was no proof the sensor was working between Friday the 9th and Monday the 12th. The trial court overruled the objection, finding that Annen's testimony established the motion sensor was working over the weekend.

¶ 15    The State was then allowed to play the video. The video, which is part of the record on appeal, contains two successive segments depicting a man in Marsh's office at approximately 5 a.m. on Saturday, December 10. The first segment, which runs from 4:52:00 to 4:52:12, shows a man entering the frame from the right, crouching behind the desk, opening the drawer, and removing the bank pouch. While doing this, the man is looking around. The second segment, which runs from 4:52:41 to 4:52:49, shows the man still crouched behind the desk, then shows him rising and turning, and exiting the frame to the right.

¶ 16    During the viewing of the videotape, defense counsel again objected, arguing that the State failed to show the recording was preserved without any changes, additions or deletions and that the 29-second skip in the tape from the end of the first segment to the beginning of the second, suggested that a portion of the tape was missing. Annen testified as follows:

> "It is because, to my knowledge, there is a time lapse, a default setting of 30 seconds, that if the camera stops sensing motion, recording stops. As soon as it senses motion again, it started again. So what I am saying, if there was motion that the camera could not see, it would stop recording and then when he moved again, that being Mr. Taylor, the camera started again.
>
> ***
>
> The camera can only see what you are seeing. It can't see below the desk. It cannot see areas of the room not in the picture. If I was below the desk and not moving, and there wasn't any view, you wouldn't be able to see any motion in the camera. It would not activate."

¶ 17    After the trial judge viewed the tape, Annen testified that the recording shown to the court was the recording he viewed on December 12 with Marsh and Mocogni and that it was

-4-

the recording taken from the DVR. Specifically, he testified:

> "Q. As this recording exists, besides focusing your recording on this specific incident, has it been altered in any way?
>
> A. No.
>
> Q. The 30 seconds that [defense counsel] referred to, do those 30 seconds exist on the recording?
>
> A. No, they don't.
>
> Q. Why don't they exist on the recording?
>
> A. The camera only records when there is motion detected and the camera is set to record long enough to capture everything, I didn't have it set long enough to record a longer period of time."

¶ 18    Annen stated the settings could be changed for the length of recording. The trial court then inquired of Annen as to exactly what that meant. Annen responded:

> "Well, your Honor, I am not an expert by any means. We had just gotten this unit, what I learned is that once it detected motion, it only recorded for a certain amount of time before it would stop if it didn't detect any more motion."

Although Annen could not recall how long the system was set to record, he acknowledged it would have been at least 15 seconds. When the trial court asked Annen to explain why the recording stopped at 4:52:12, Annen stated:

> "My only explanation, your Honor, is that when he [the defendant] crouched, he was crouched for a long enough time and still from the camera site up, he might have been–if he was moving his hands or doing anything below that site, it could have caused it to not sense any motion. As soon as he moved, that is when it kicked on again. You saw him rising and turning to leave the room, that is my best explanation."

¶ 19    Kevin Marsh and Paul Mocogni both testified on behalf of the State and were both shown the videotape. They described what was depicted and identified defendant as the individual who appears in the tape.

¶ 20    In finding defendant guilty, the trial court commented as follows:

> "The video does have a missing segment of 30 seconds. I suppose a lot of things could have happened in that 30 seconds. There's no evidence that anything did happen other than we missed some of the activity as far as the defendant. He had the pouch in his hand at one point. The officer, I'm convinced, gave a reasonable explanation of why we're missing that 30 seconds. I don't see any intentional destruction of evidence. He explained it was the motion sensor. ***
>
> But I'm satisfied the video does establish the defendant's presence in the room where he had no authority to be. It shows him with the pouch, which he clearly had no authority to take. And that, along with the testimony about the missing money, I think is sufficient, even without the admissions, to convict, to establish guilt beyond a reasonable doubt."

The trial court found defendant guilty of misdemeanor theft.

¶ 21        Thereafter, defendant filed a motion to reconsider or in the alternative for a new trial, arguing, *inter alia*, that the State had failed to lay a proper foundation and, therefore, the VHS tape should not have been admitted. Defendant again referred to the 30-second skip in the recording. In addressing defendant's motion, the trial court commented as follows:

> "With respect to the videotape, I think the record from the trial and my ruling on the motion in limine frankly addressed all of the issues that are raised in this motion. I viewed the videotape several times. I think we all agreed that according to the timer shown in the videotape, there was 30 seconds [defense counsel] referred to it as missing. I don't know that I would so much refer to it as missing based on the explanation the officer gave. This was a motion actuated video recorder or camera. He testified that when it was initially installed it shut off after a period of time if there was no motion detected and gave an explanation for why we had a jump from one view of the defendant removing some objects from underneath the desk where the money was to be found missing, and then we showed another view again according to the timer starting 30 seconds later the defendant moving from that same position moving away and out of the room. The officer testified that he set it up, he was instructed as to how the video camera and recorder operated. He believed it to be working properly. There was no indication that this had changed in any way from the time he viewed it on Monday morning I believe after the money was found missing. *** I don't think that frankly casts any doubt on the fact that it clearly showed the defendant in the room where the money was found missing, reaching under the desk, looking furtively about and removing an object and doing something with an object which appeared to be consistent with the money purse or case that the money was contained in."

Accordingly, the court found there was a proper foundation for admission of the tape and denied defendant's motion.

¶ 22        Defendant appealed. The appellate court reversed and remanded. 398 Ill. App. 3d 74. Citing to *People v. Vaden*, 336 Ill. App. 3d 893 (2003), the appellate court noted that under the "silent witness" theory, photographic or videotape evidence may be admitted without an eyewitness to establish the accuracy of the images depicted if there is sufficient proof of the reliability of the process that produced the photograph or videotape. The appellate court then held that the State failed to lay a proper foundation for admission of the VHS tape because it failed to establish the reliability of the process that produced the tape. Specifically, according to the court, the State failed to establish a proper chain of custody, failed to establish that the camera was working properly and the original DVR recording had been preserved, and failed to give an explanation of the process of copying the recording on the DVR to the VHS tape. As such, the appellate court found that the State failed to establish even the probability that the VHS tape had not been tampered with.

¶ 23        We granted the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010).

ANALYSIS

¶ 25 Standard of Review

¶ 26 The parties dispute the standard of review. The State contends that we should review the trial court's decision to admit the VHS tape under an abuse of discretion standard. Defendant contends that we should review the trial court's decision to admit the VHS tape *de novo* because, according to defendant, "the legal admissibility of evidence on foundation grounds 'is subject to a *de novo* standard of review.' " We agree with the State.

¶ 27 In *Cisarik v. Palos Community Hospital*, 144 Ill. 2d 339 (1991), we pointed out that videotapes are admissible on the same basis as photographs. *Cisarik*, 144 Ill. 2d at 342. The admission of photographs is entrusted to the trial court's discretion. *People v. Smith*, 152 Ill. 2d 229, 263 (1992). In *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 284 (2003), we noted that videotapes may be admitted if properly authenticated, which is an evidentiary question (*Cryns*, 203 Ill. 2d at 283), and we specifically stated, "[t]he admission of a videotape into evidence is within the sound discretion of the circuit court and will not be disturbed absent an abuse of discretion." *Cryns*, 203 Ill. 2d at 284. See also Jordan S. Gruber, *Videotape Evidence*, *in* 44 Am. Jur. Trials § 53, at 277 (1992) ("admissibility ultimately turns on the trial judge's judgment and discretion in interpreting the circumstances of each particular case"). See also *People v. Williams*, 188 Ill. 2d 365, 369 (1999) (reviewing courts should defer to trial court's evidentiary rulings even if they involve legal issues unless "trial court's exercise of discretion has been frustrated by an erroneous rule of law"); *People v. Woods*, 214 Ill. 2d 455, 471 (2005) ("[a] chain of custody is used to lay a proper foundation for the admission of evidence" and, thus, "a challenge to the chain of custody is an evidentiary issue"). Accordingly, we review the trial court's decision to admit the VHS tape under the abuse of discretion standard. Under this standard, an abuse occurs when the trial court's ruling is fanciful, unreasonable or when no reasonable person would adopt the trial court's view. *People v. Baez*, 241 Ill. 2d 44, 106 (2011); *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 28 Forfeiture

¶ 29 The State first contends that defendant has forfeited any challenge to the admission of the VHS tape on the grounds that (1) the VHS tape was a duplicate recording; (2) the State failed to explain the process used to create the duplicate, (3) the State failed to show a chain of custody, and (4) the State failed to preserve the original recording. According to the State, defendant did not object on these grounds at trial or in his posttrial motion. We agree. At trial, defendant objected to the VHS tape on the following grounds: (1) there was a 30-second jump with no explanation; (2) the camera was not working properly; (3) the evidence did not show Annen was competent to operate the equipment; and (4) the State failed to preserve the recording without changes, additions or deletions as shown by the 30-second jump. Contrary to defendant's contention, the objections defendant made at trial do not encompass all of the challenges he now raises.

¶ 30 Defendant maintains, however, that if we conclude he did in fact forfeit some of the challenges he raises in this appeal, we should review them under the plain-error doctrine.

Under the plain-error doctrine, this court will review forfeited challenges when: (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) a clear or obvious error occurred, and the error is so serious that it affected the fairness of the defendant's trial and the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). In undertaking this review, it is appropriate to first determine whether error occurred at all. *People v. Williams*, 193 Ill. 2d 1, 27 (2000). We turn, then, to whether error occurred in this case.

¶ 31                              Admissibility of Videotape

¶ 32    Historically, photographic evidence was admitted as demonstrative evidence. See Tracy Bateman Farrell, *Construction and Application of Silent Witness Theory*, 116 A.L.R.5th 373, 373 (2004). Such evidence had no significance apart from the ability to illustrate something testified to by a witness. Jordan S. Gruber, *Videotape Evidence*, *in* 44 Am. Jur. Trials 171, § 45, at 267 (1992). Most jurisdictions now allow photographs and videotapes to be introduced as substantive evidence so long as a proper foundation is laid. *Id.* Such evidence is generally admitted under the "silent witness" theory. Jordan S. Gruber, *Foundation for Contemporaneous Videotape Evidence*, *in* 16 Am. Jur. Proof of Facts 3d 493, § 4, at 507 (1992). Under this theory, a witness need not testify to the accuracy of the image depicted in the photographic or videotape evidence if the accuracy of the process that produced the evidence is established with an adequate foundation. In such a case, the evidence is "received as a so-called silent witness or as a witness which 'speaks for itself.' " *Id.* § 5, at 508. The silent witness theory was originally utilized in Illinois and elsewhere in connection with the admissibility of X-rays. *Id.* See *Stevens v. Illinois Central R.R. Co.*, 306 Ill. 370, 375 (1922). The majority of cases now involve automatic cameras or surveillance systems where videotapes, CDs or DVDs are made from the system and sought to be admitted. Tracy Bateman Farrell, *Construction and Application of Silent Witness Theory*, 116 A.L.R.5th 373, § 2(a) (2004). See also Jordan S. Gruber, *Foundation for Contemporaneous Videotape Evidence*, *in* 16 Am. Jur. Proof of Facts 3d 493, § 25, at 537 (1992) ("Automatic surveillance pictures are, of course, one of the prototypical situations in which the 'silent witness' theory has been applied").

¶ 33    This court has not addressed the foundational requirements for establishing the accuracy of a process that produces surveillance camera recordings. A majority of jurisdictions addressing this issue have set forth various relevant factors to consider. See *United States v. Reed*, 887 F.2d 1398, 1405 (11th Cir. 1989) (although government should produce evidence regarding competency of recording machine operator, fidelity of equipment, absence of alterations to recording, and identity of individual or object depicted, "the trial court has broad discretion to allow [media] into evidence without such a showing so long as there is independent evidence of accuracy"); *United States v. Harris*, 55 M.J. 433, 439-40 (C.A.A.F. 2001) (foundation for authentication of photos taken by automated camera: (1) system was reliable; (2) system was in working order when photo was taken; and (3) film was handled and safeguarded properly from time it was removed from camera until time of trial); *Ex Parte Fuller*, 620 So. 2d 675, 678 (Ala. 1993) (adopting a seven-part test: (1) showing that

system used "was capable of recording what a witness would have seen or heard had a witness been present at the scene or event recorded"; (2) showing operator was competent; (3) "establish[ing] *** the authenticity and correctness of the resulting recording"; (4) showing no alterations had been made; (5) showing manner by which "recording *** was preserved"; (6) "identif[ying] *** the speakers, or persons pictured" and (7) in criminal cases, showing any statements made were voluntary); *State v. Haight-Gyuro*, 186 P.3d 33 (Ariz. Ct. App. 2008) (adopting flexible approach to allow trial court to consider unique facts and circumstances of each case; authentication requires sufficient evidence to allow jury to conclude video depicts with reasonable accuracy transaction/event at issue); *Wagner v. State*, 707 So. 2d 827, 831 (Fla. Dist. Ct. App. 1998) (in determining whether recording fairly and accurately depicts what it purports to be, five factors considered: evidence of time and date; presence or absence of evidence of tampering; operating condition and capability of equipment as it relates to accuracy and reliability of product; operating, testing, and security procedures; and identification of participants depicted in recording); *Edwards v. State*, 762 N.E.2d 128, 136 (Ind. Ct. App. 2002) (strong showing of authenticity and competency based on particular facts; with respect to automatic cameras, there must be evidence of how and when camera was loaded, how frequently it is activated, when photographs were taken, and nature of processing and chain of custody after it was removed from camera); *Washington v. State*, 961 A.2d 1110, 1116 (Md. 2008) (surveillance tapes and photographs made by surveillance equipment that operated automatically admissible when "a witness testifies to the type of equipment or camera used, its general reliability, the quality of the recorded product, the process by which it was focused, or the general reliability of the entire system"); *State v. Anglemyer*, 691 N.W.2d 153 (Neb. 2005) (requirement for admission does not require proponent to rule out all possibilities inconsistent with authenticity or reliability).

¶ 34    Most jurisdictions point out that the circumstances of each case and, thus, the requirements to guarantee the genuineness of the evidence, will always differ. See, *e.g.*, *United States v. Oslund*, 453 F.3d 1048, 1054 (8th Cir. 2006). Thus, while most courts set forth various factors to consider when assessing the process that produced the recording, these factors are not deemed exclusive foundation requirements. Jordan S. Gruber, *Videotape Evidence*, *in* 44 Am. Jur. Trials 171, § 60, at 287 (1992); Jordan S. Gruber, *Foundation of Contemporaneous Videotape Evidence*, *in* 16 Am. Jur. Proof of Facts 3d 493, §§ 9, 16, at 513-14, 526 (1992). See also Carl T. Drechsler, *Admissibility of Videotape Film in Evidence in Criminal Trial*, 60 A.L.R.3d 333, § 2(a) (1974). See, *e.g.*, *Lorraine v. Markel American Insurance Co.*, 241 F.R.D. 534, 544 (D. Md. 2007); *State v. Haight-Gyuro*, 186 P.3d 33 (Ariz. Ct. App. 2008); *Department of Public Safety & Correctional Services v. Cole*, 672 A.2d 1115 (Md. 1996).

¶ 35    Similar to the foregoing cases, the appellate court in the case at bar looked to several factors in determining whether a proper foundation had been laid for the admission of the VHS tape: (1) the device's capability for recording and general reliability; (2) competency of the operator; (3) proper operation of the device; (4) showing the manner in which the recording was preserved (chain of custody); (5) identification of the persons, locale, or objects depicted; and (6) explanation of any copying or duplication process. We agree that these factors may be considered when determining whether the process by which a

-9-

surveillance videotape was produced was reliable. However, like other jurisdictions, we emphasize that this list of factors is nonexclusive. Each case must be evaluated on its own and depending on the facts of the case, some of the factors may not be relevant or additional factors may need to be considered. The dispositive issue in every case is the accuracy and reliability of the process that produced the recording.

¶ 36    Although we agree with the appellate court's choice of factors to consider, we disagree with the appellate court's conclusion that the evidence failed to demonstrate the VHS tape was admissible. The appellate court concluded that the State failed to establish the camera was working properly; failed to give an explanation of the process of copying the recording from the DVR to the VHS tape; failed to establish a sufficient chain of custody; failed to preserve the original; and failed to establish there were no alterations, deletions, or changes made to the original. As such, the appellate court found that the State failed to establish even the probability that the VHS tape had not been tampered with. We disagree with the appellate court's analysis and find that the State laid a sufficient foundation for admission of the VHS tape.

¶ 37    Annen testified that he had recently purchased the surveillance system which consisted of the motion-activated wireless digital camera, a wireless transmitter and the DVR. Although Annen had not used the equipment before placing it in Marsh's office, an individual from the store instructed him on how to use it. In addition, he read the instructions which came with the equipment.

¶ 38    On December 1, Annen set up the system in Marsh's office. He returned to Marsh's office on December 4. At this time, the camera had been triggered and a recording had been made, but the images could not be seen because of insufficient light. On December 9, Annen took measures to correct the situation and then tested the system by having Marsh walk in front of the camera. It was triggered and recording began. When Annen returned on December 12, the camera had again been triggered. He, along with Marsh and Mocogni, viewed the recording from the DVR via a monitor and observed that two segments had been recorded.

¶ 39    The appellate court found that the State failed to demonstrate the camera was functioning properly, focusing on the fact one segment recorded for only 6 seconds yet, according to testimony at trial, the camera was set to record for at least 15 seconds after it was activated. 398 Ill. App. 3d at 87. It is unclear where the appellate court derived the 6-second figure. The record discloses that the first segment recorded for 12 seconds, nothing recorded for 29 seconds, then the second segment recorded for 8 seconds. In any event, the fact that the camera recorded for fewer than 15 seconds is not fatal to a finding that the camera was working properly. While the camera may not have worked perfectly, it clearly worked. As one court has stated, "[t]he fact that the tape[ ] exist[s] at all is evidence that the tape recorder was functional and that [the operator] knew how to operate it." *Willett v. Russell M. Stookey, P.C.*, 568 S.E.2d 520, 526 (Ga. Ct. App. 2002). Moreover, "the evidence showed that the camera was working at least well enough for the events and persons portrayed thereon to be recognizable." *Smith v. State*, 647 S.E.2d 346, 349 (Ga. Ct. App. 2007). See *Oslund*, 453 F.3d at 1056; *Robinson v. State*, 621 So. 2d 389 (Ala. Crim. App. 1993). See also Carl T. Drechsler, *Admissibility of Videotape Film in Evidence in Criminal Trial*, 60 A.L.R.3d 333,

§ 2(a) (1974) ("[T]he fact that portions of a [recording] are inaudible or incomplete does not bar the use of the film as evidence, unless *** [it is] so substantial as to render the film as a whole untrustworthy"); Jordan S. Gruber, *Foundation for Contemporaneous Videotape Evidence*, *in* 16 Am. Jur. Proof of Facts 3d 493, § 27, at 539-40 (1992) (videotape may have technical problems, including missing segments; however, this does not require automatic exclusion if videotape is sufficiently probative and that decision is left to sound discretion of trial judge); Jordan S. Gruber, *Videotape Evidence*, *in* 44 Am. Jur. Trials 171, § 67, at 300 (1992) (same). The State adequately demonstrated the camera and system were able to record and were generally operating properly.

¶ 40    The appellate court further found the VHS tape inadmissible because the State failed to give an explanation of the process of copying the recording from the DVR to the VHS tape. 398 Ill. App. 3d at 87. The Deerfield police report summary states that Annen "made a copy of the video surveillance on the hard drive, specifically the segment where Taylor was in Marsh's office[,] onto a VHS tape." The appellate court evidently refused to consider this report because, in its view, it was not "evidence." 398 Ill. App. 3d at 87 n.2. This was error. It is widely recognized that when the trial court addresses preliminary questions, like the admissibility of evidence, it is not constrained by the usual rules of evidence. Ralph Ruebner, Illinois Criminal Trial Evidence 3 (4th ed. 2001); 11 Ill. Prac., Courtroom Handbook on Illinois Evidence § 104.1 (2001). See also Ill. R. Evid. 104(a) ("Preliminary questions concerning *** the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination, the court is not bound by the rules of evidence except those with respect to privileges."). What this means is: "the court may consider hearsay or other evidence that would not be admissible if offered to the jury." *Lorraine*, 241 F.R.D. at 539; Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 901.06(1)(c)(iii) (2d ed. 1997) ("Rule 104(a) provides that inadmissible evidence may be considered in determining preliminary questions of admissibility"). Thus, the appellate court should have considered the report in determining the admissibility of the videotape and erred when it said there was no explanation of the copying process.

¶ 41    The appellate court next found the VHS tape was not admissible because the State failed to show a sufficient chain of custody. 398 Ill. App. 3d at 87-88. We disagree with this conclusion as well. According to the Deerfield police report, after Annen made the VHS tape copy, he locked the VHS tape in his desk "to be later locked in an evidence locker." As discussed above, the appellate court erred in refusing to consider the Deerfield report. Second, if there are other factors demonstrating the authenticity of the recording, a strict proof of chain of custody is not necessary. See *Garvey v. Chicago Rys. Co.*, 339 Ill. 276, 291 (1930) ("it is not absolutely essential that all these particular conditions be met[;] *** they are not exclusive). Moreover, this court has repeatedly stated, *albeit* in a different context, that gaps in the chain of custody go to the weight of the evidence, not its admissibility. *People v. Alsup*, 241 Ill. 2d 266, 275 (2011); *People v. Williams*, 238 Ill. 2d 125, 150 (2010). See also *Harris*, 55 M.J. at 440 ("[g]aps in the chain of custody 'go to the weight of the evidence, rather than its admissibility' " (quoting *United States v. Maxwell*, 38 M.J. 148, 152 (C.M.A. 1993))); *People v. Campbell*, 885 N.Y.S.2d 155, 157-58 (N.Y. App. Div. 2009) (gap in chain of custody goes to weight of evidence, not admissibility).

¶ 42    The appellate court also found the VHS tape was inadmissible based on the fact the State failed to preserve the original DVR recording. 398 Ill. App. 3d at 87, 96. There are several problems with the appellate court's analysis and conclusion with respect to preservation of the "original." "[W]ritings" and "recordings" are commonly identified as "letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, or other form of data compilation." *Lorraine*, 241 F.R.D. at 577. "Photographs" include "still photographs, x-ray films, video tapes, and motion pictures." *Lorraine*, 241 F.R.D. at 577. See also Ill. R. Evid. 1001(2) (including "similar or other products or processes which produce recorded images"). An "original" of a "writing" or "recording" consists of "the writing or recording itself or any counterpart intended to have the same effect by a person executing or issuing it. An 'original' of a photograph includes the negative or any print therefrom. If data are stored in a computer or similar device, any printout or other output readable by sight, shown to reflect the data accurately, is an 'original.' " *Lorraine*, 241 F.R.D. at 577.

¶ 43    A finding that the VHS tape was not an original cannot be reconciled with these definitions. The VHS tape was made by copying the data stored on the hard drive of the DVR and, therefore, satisfies the definition of "original." See *Commonwealth v. Leneski*, 846 N.E.2d 1195, 1198-99 (Mass. App. Ct. 2006) (videotapes, like photographs, are not subject to the best evidence rule and the same is true for digital images placed and stored on a hard drive and transferred to a CD; thus, a CD would be an original). The State was not required to bring the DVR system into court to show the surveillance video.

¶ 44    Lastly, the appellate court concluded that the State failed to establish that *no* alterations, deletions or changes had been made when the original DVR recording was copied to the videotape. 398 Ill. App. 3d at 86. Such a requirement is overly restrictive. Given the particular circumstances of any case, alterations, deletions, or editing may be necessary. As has been stated, "[o]f course, some editing may be necessary to make the evidence admissible in the first place." Jordan S. Gruber, *Foundation for Contemporaneous Videotape Evidence*, *in* 16 Am. Jur. Proof of Facts 3d 493, § 17, at 528 (1992). For example, unimportant, irrelevant, prejudicial, privileged and/or confidential material should be removed. See Jordan S. Gruber, *Videotape Evidence*, *in* 44 Am. Jur. Trials 171, § 17, at 221 (1992) ("Where irrelevant or prejudicial material is deleted, editing may make an otherwise inadmissable videotape admissible. Where technical difficulties or distortions are addressed, editing may make the videotape evidence more understandable and thus more useful to the trier of fact."). See also Jordan S. Gruber, *Foundation for Contemporaneous Videotape Evidence*, *in* 16 Am. Jur. Proof of Facts 3d 493, § 26, at 538 (1992) ("If a videotape contains irrelevant, prejudicial, or incompetent segments, the opponent of the evidence should request that the trial judge order the videotape edited or played back so that the jury is exposed to only fully admissible material."). In general, most editing will not render evidence inadmissable but rather will go to the weight of that evidence. Jordan S. Gruber, *Foundation for Contemporaneous Videotape Evidence*, *in* 16 Am. Jur. Proof of Facts 3d 493, § 17, at 527 (1992); Jordan S. Gruber, *Videotape Evidence*, *in* 44 Am. Jur. Trials 171, § 31, at 242 (1992). The more important criteria is that the edits cannot affect the reliability or trustworthiness of the recording. In other words, the edits cannot show that the recording was

tampered with or fabricated. There is no evidence here that the VHS tape was the result of tampering or fabrication. Indeed, as the appellate court itself noted, Annen's testimony established the "recording in court was the same as the one he watched with Marsh and Mocogni." 398 Ill. App. 3d at 87. The appellate court's statement demonstrates that the tape had not been tampered with and that the recording shown in court was the original as it was taken from the DVR.

¶ 45                                   CONCLUSION

¶ 46        We find that the totality of the evidence presented demonstrates that the State laid a proper foundation for admission of the VHS tape. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the VHS tape and, thus, there was no plain error. Therefore, we reverse the judgment of the appellate court and affirm the judgment of the circuit court.

¶ 47        Appellate court judgment reversed;
¶ 48        circuit court judgment affirmed.