# In the Iowa Supreme Court

No. 23–1390

Submitted September 09, 2025—Filed October 3, 2025

**State of Iowa,**

Appellee,

vs.

**Terence Edward Manning Jr.,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Heather Lauber, judge.

The State seeks further review of a court of appeals decision reversing a conviction for willful injury causing serious injury. **Decision of Court of Appeals Vacated; District Court Judgment Affirmed.**

Christensen, C.J., delivered the opinion of the court, in which all justices joined.

Martha J. Lucey, State Appellate Defender, and Mary K. Conroy, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney General, for appellee.

**Christensen, Chief Justice.**

The law is always adapting to technology, and this case is no exception. When police officers responded to a report of a physical altercation in a gas station parking lot, they were able to watch a recording of the altercation on the store's surveillance video through a screen behind the sales counter. One of the officer's bodycams recorded the surveillance video as he watched it, and the State sought to admit this bodycam recording of the surveillance video into evidence after law enforcement and store errors rendered the original surveillance video unavailable. The district court admitted the bodycam recording over the defendant's objection, concluding that the officer could authenticate it through his testimony. A jury convicted the defendant of willful injury causing serious injury in violation of Iowa Code section 708.4(1) (2022).

On appeal, the court of appeals concluded that the district court erred by admitting the bodycam recording, reasoning that neither the officer's testimony nor the testimony of other witnesses properly authenticated the recording. It reversed the defendant's conviction and remanded for a new trial. We granted the State's application for further review and vacate the court of appeals decision. Although the officer's testimony was insufficient to authenticate the contents of the recording, subsequent testimony from the victim properly authenticated the recording. Accordingly, we affirm the defendant's conviction and sentence.

### I. Background Facts and Proceedings.

Following a holiday party on December 26, 2022, that ended in an argument with his girlfriend, Terence Manning Jr. retrieved a ride home from his girlfriend's mother, Mary. Mary's fiancé, Samuel (pseudonym), accompanied her in the passenger seat, and Manning sat in the back seat on the driver's side. During the ride, Manning began "cussing [Mary] out" and "being disrespectful,"

prompting Mary to pull into the QuikTrip parking lot, where Samuel ordered Manning to exit the vehicle.

When Manning refused, Samuel got out and opened the door to Manning's seat. Samuel and Manning agree that the two pulled the door back and forth multiple times, but the portion of the QuikTrip surveillance video showing their vehicle is too small on the screen to see that interaction clearly. We do not get a clear view in our record of the events depicted in the surveillance video until the vehicle backs up from a parking space before stopping in the middle of the parking lot, where Samuel exited the passenger side door and walked around the back of the vehicle.

As Samuel approached the driver's side, Manning got out and punched him. Samuel fell to the ground, and Manning punched Samuel in the head again. Samuel tried to get up, but Manning pushed him while he was on the ground and kicked him in the head twice. Manning briefly walked away, allowing Samuel to stand up with both hands raised. Manning turned toward Samuel and declared, "I will put you to sleep. I'll kill you. I will knock you out," before punching Samuel in the head again. Samuel fell and hit his head on the pavement. From this point on, Samuel had no recollection of the events.

The store clerk had called the police, and two police officers responded and found Samuel inside the store "covered in blood" with "a very swollen lip, very swollen facial features, cheek, [and] eye." Samuel lost four teeth and suffered a concussion, right cornea abrasion, and fractures to his right maxilla and the lateral wall of his right orbit. Officer Joshua Leibold spoke with Samuel and Mary about what occurred and documented Samuel's injuries, while Officer Jackson Bruckner worked with the store clerk and QuikTrip security to view the surveillance video footage of the parking lot. Officer Bruckner watched the

surveillance video on a screen behind the store counter that QuikTrip security controlled remotely to zoom in on the screen's contents and change camera angles. As Officer Bruckner watched, his bodycam also recorded the surveillance video playing on the screen.[1]

In the meantime, Officer Leibold located and arrested Manning at another store across from QuikTrip. Manning claimed he acted in self-defense, insisting that Samuel was "the aggressor." Manning declared that Samuel "came on the other side and kept telling me 'come outside' and wanting to fight. And I stayed in the car, and I didn't want to fight." He alleged that Samuel "tried to start smacking [him] from the front seat to the back seat" and attempted to "throw [him] out [of] the car repeatedly." Additionally, Manning stated, "I locked the door on him and somehow the door got unlocked," and this was when Manning exited the vehicle and "just defended [him]self." The State charged Manning with willful injury causing serious injury, a class "C" felony, in violation of Iowa Code section 708.4(1).

Manning opted for a jury trial. Outside of the jury's presence, Manning moved to exclude the surveillance video that was captured on Officer Bruckner's bodycam on authentication and best evidence grounds. The State resisted, explaining that QuikTrip sent the wrong time stamps of the original video to the detective, who did not realize the mistake in time to obtain the correct footage.

The district court allowed Manning to voir dire Officer Bruckner before ruling on the motion. Officer Bruckner testified that he was not in control of the security camera while he was observing the footage. He further testified that his bodycam footage was not altered, and there were no allegations that the

---

[1]It is the footage of the surveillance video captured on the bodycam video that is in dispute.

surveillance video itself had been altered. The district court allowed the State to admit the bodycam footage through Officer Bruckner's testimony.

Samuel testified for the State. He stated that he ordered Manning out of the vehicle, but maintained that he never touched or threatened Manning. Samuel described his injuries and remarked that he may have blacked out and could not remember anything after the second hit to the ground. The State also presented testimony from Officer Leibold, photographs of Samuel's injuries, and Officer Leibold's dashcam video of Manning's statements to him following his arrest.

When the State played part of Officer Bruckner's bodycam footage, Samuel initially claimed that the vehicle shown in the video was not the one they were riding in that night. But after watching more of the video, Samuel indicated that he could not remember which vehicle they were using that night. He later confirmed that he was the person shown being hit and falling to the ground in the video.

Manning testified in his own defense, reiterating his claims of self-defense. We are summarizing but not considering Manning's trial testimony in our analysis or compilation of the facts because it is unclear whether Manning would have testified absent the district court's admission of the surveillance video. Instead, we are relying on the dashcam video of Manning's statements to Officer Leibold in the police vehicle following his arrest, which was admitted without objection at trial.

The jury convicted Manning as charged. The district court sentenced him to a term of up to ten years in prison, and Manning timely appealed. We transferred his case to the court of appeals, which concluded that the district court erred in admitting Officer Bruckner's bodycam footage. It reversed

Manning's conviction and remanded for a new trial. We granted the State's application for further review.

## II. Analysis.

Manning challenges the district court's admission of the bodycam footage and the sufficiency of the evidence to support his conviction. We review the district court's evidentiary ruling for an abuse of discretion. *See State v. Slaughter*, 3 N.W.3d 540, 546 (Iowa 2024). An abuse of discretion occurs when the district court exercises its discretion on grounds that are clearly untenable or unreasonable because they are based on an erroneous application of the law or not supported by substantial evidence. *Id.* at 546–47.

We review Manning's challenge to the sufficiency of the evidence for the correction of errors at law. *See id.* at 546. In doing so, "we are highly deferential to the jury's verdict," which is binding if there is substantial evidence to support it, and view the evidence in the light most favorable to the State. *Id.* (quoting *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021)). "Evidence is substantial if it is 'sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt.' " *Id.* (quoting *Jones*, 967 N.W.2d at 339).

**A. Subsequent Witness Testimony Remedied the District Court's Premature Admission of the Video Without a Proper Foundation.** Manning contends that the district court erred in admitting Officer Bruckner's bodycam recording of the QuikTrip surveillance video over Manning's authentication objection. To satisfy Iowa Rule of Evidence 5.901(*a*)'s authentication requirement, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." In the video context, authentication "demands only that the fidelity of the [video's] portrayal be established." *State v. Deering*, 291 N.W.2d 38, 40 (Iowa 1980). Conventionally,

this occurs when "a witness to the event purportedly depicted by the [video] testifies that the [video] accurately portrays that event." *Id.*

When no firsthand witness is available, "courts have adopted the 'silent witness' theory to admit video recordings." *State v. Stangle*, 97 A.3d 634, 637 (N.H. 2014) (quoting *People v. Tuncap*, No. CRA12–032, 2014 WL 235471, at *6 (Guam Jan. 16, 2014)); *see also State v. Luke*, 464 P.3d 914, 926 (Haw. Ct. App. 2020) (listing other state courts that have adopted the "silent witness" theory). Under this theory, a video recording is admissible as the primary evidence of the events depicted, and "the evidence is received as a so-called silent witness or as a witness which speaks for itself." *Stangle*, 97 A.3d at 637 (quoting *People v. Taylor*, 956 N.E.2d 431, 438 (Ill. 2011)). No direct witness testimony is necessary "if the accuracy of the process that produced the [video] evidence is established with an adequate foundation." *Id.* (quoting *Taylor*, 956 N.E.2d at 438). We adopted this approach to the silent witness theory in *State v. Holderness*, 293 N.W.2d 226, 230 (Iowa 1980), by holding that a witness "who describes the photographic process employed and testifies it produces accurate pictures" can authenticate photographic evidence.

It is also the proper approach for evidence of video recordings when a direct witness is unavailable because it allows the district court "to consider the unique facts and circumstances in each case—and the purpose for which the evidence is being offered—in deciding whether the evidence has been properly authenticated." *State v. Haight-Gyuro*, 186 P.3d 33, 37 (Ariz. Ct. App. 2008). In doing so, the district court's focus should be on whether the proponent of the evidence presented "adequate foundational facts" that would allow "the trier of fact [to] reasonably infer that the subject matter is what its proponent claims."

*Stangle*, 97 A.3d at 638 (quoting *Fisher v. State*, 643 S.W.2d 571, 575 (Ark. Ct. App. 1982)).

Here, that would include "evidence describing the process or system that produced the videos and showing that the video is an accurate representation of the events in question." *Toney v. State*, 206 N.E.3d 1153, 1155 (Ind. Ct. App. 2023); *see also* Iowa R. Evid. 5.901(*b*)(9) ("[E]vidence that satisfies the [authentication] requirement [includes] . . . [e]vidence describing a process or system and showing that it produces an accurate result."). That was not present here. Instead, Officer Bruckner's testimony established that he had little knowledge of the process or system that produced the surveillance video.

Officer Bruckner testified that he had to talk to someone from QuikTrip's security team over the phone to watch the surveillance video in the store, but he did not know who that person was. It is clear from the bodycam footage in the record that someone is zooming in on the video and switching camera angles, but Officer Bruckner testified that it was someone from QuikTrip controlling the screen. He also stated that he did not know how many cameras there were or how the QuikTrip security camera system worked, recorded, or stored footage. *Cf. Haight-Gyuro*, 186 P.3d at 37 (holding a store employee's testimony authenticated the store's surveillance video because the employee testified about his responsibilities of maintaining the surveillance system, how many cameras were involved, where the cameras were located, how they operated, and the process of obtaining copies of video recordings for law enforcement). This testimony was inadequate to conclude that the surveillance video shown in Officer Bruckner's bodycam footage accurately depicted the events at issue. The State did not call any other witnesses to authenticate the surveillance video.

However, our inquiry does not end there. The State argues that it was able to remedy any premature admission of the surveillance video captured on Officer Bruckner's bodycam through subsequent evidence and testimony.[2] As a general legal principle, the State is correct that a new trial is unwarranted when later testimony cures the district court's error of admitting evidence before the proper foundation was laid. *See* Iowa R. Evid. 5.103(*a*) (noting relief on evidentiary error is only appropriate when "the error affects a substantial right of the party"); *State v. Canady*, 4 N.W.3d 661, 668 (Iowa 2024) (affirming the admission of a recording over an authenticity objection based on the state's approach to laying the foundation for the recording throughout the trial); *see also State v. Canady*, No. 22–0397, 2023 WL 4531668, at *5 n.8 (Iowa Ct. App. July 13, 2023), *vacated on other grounds*, 4. N.W.3d 661 ("Canady complains the district court admitted the call before all these identifications were made. But any alleged error in the premature admission of the recording was harmless, as the necessary foundation was ultimately laid.").

"Of course[,] a party should lay the proper foundation before offering recordings for admission into evidence," but "we will not reverse a defendant's conviction simply because the full foundation for its authentication was laid after the evidence was admitted." *United States v. Kimble*, 54 F.4th 538, 549–50 (8th Cir. 2022) (affirming the admission of retroactively authenticated evidence under the federal equivalent of Iowa Rule of Evidence 5.901(*a*)). Here, the district court admitted the video evidence through Officer Bruckner's testimony, but it also explained that "should the victim testify in this case[,] . . . he could after[,]

---

[2]The State also contends that Manning's testimony at trial authenticated the surveillance video. It is unclear from the record whether Manning would have testified had the district court granted his request to exclude the video from trial. Nevertheless, we need not address this issue because other evidence was sufficient to authenticate the video regardless of Manning's testimony.

watching the video[,] authenticate it by indicating it was a fair and accurate depiction of what occurred at the time of the assault."

The law supports the State's position. A recording is admissible "as long as the totality of the circumstances satisf[ies] a court that the recording is reliable." *Id.* at 547. True, Samuel initially denied that the vehicle shown in the video was the one he was riding in that night and expressed some confusion about what occurred because he blacked out "after the second hit." He explained that it then took him "a couple minute[s] to get up, . . . especially after the kick in my head that made me . . . fall asleep."

But his testimony ultimately confirmed the accuracy of the video up to the second hit to the ground. This includes Samuel's testimony on how they pulled into the QuikTrip parking lot and ordered Manning out of the vehicle for "being disrespectful." He described where everyone was seated in the vehicle, how he exited the vehicle to open Manning's door, and how Manning "started punching me in the face, break all my teeth and everything."

Ultimately, authenticity only requires circumstantial evidence proving "that the [evidence] is what the party claims it is." *United States v. May*, 131 F.4th 633, 640 (8th Cir. 2025) (discussing Federal Rule of Evidence 901(*a*), which uses the same language as Iowa Rule of Evidence 5.901(*a*)). "Clear, certain and positive proof is generally not required." *State v. Collier*, 372 N.W.2d 303, 308 (Iowa Ct. App. 1985) (en banc). Nor does it "require an explanation of all the circumstances surrounding a piece of evidence." *State v. English*, No. 21–0315, 2022 WL 3052322, at *5 (Iowa Ct. App. Aug. 3, 2022). Rather, "a proponent must merely provide sufficient information that *could* allow a jury to determine the evidence is what the proponent claims." *Id.* Samuel's testimony could allow the jury to determine that the surveillance video was authentic up until Samuel's

second hit to the ground. Because Manning's assault on Samuel was complete at that point, the minimal additional footage shown to the jury from after that second hit to the ground was harmless.

**B. The District Court Was Within Its Discretion to Reject Manning's Best Evidence Objection.** Manning also contests the district court's admission of the video over his objection under the best evidence rule, which states that "[a]n original writing, recording, or photograph is required to prove its content, unless these rules or a statute provides otherwise." Iowa R. Evid. 5.1002. A relevant exception is for a "duplicate" or "counterpart . . . that accurately reproduces the original." *Id.* r. 5.1001(*e*). This "is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." *Id.* r. 5.1003. Manning argues that the district court improperly applied this exception given his challenge to the video's authenticity, which also made it unfair to admit the video.

Yet, Manning did not seriously dispute the content of the video at trial. While he remarked that the video was "being manipulated, not in a nefarious sense but going back and forth between different screens" and "zooming in," Manning focused his objection on the State's explanation for why the original surveillance video was unavailable. Plus, Manning confirmed much of the video's content to Officer Leibold following his arrest. *See id.* r. 5.103(*a*) (noting relief on evidentiary error is only appropriate when "the error affects a substantial right of the party"). The best evidence rule does not apply when the content of the evidence is not in dispute. *State v. Khalsa*, 542 N.W.2d 263, 268 (Iowa Ct. App. 1995).

On appeal, Manning states that "the failure to obtain a complete duplicate of the original surveillance video was due to errors made by both law enforcement and QuikTrip," but he does not provide any substantial argument as to why this required exclusion of the evidence. *See id.* ("The 'Best Evidence' rule requires production of original documents unless their absence is sufficiently explained."). The district court was satisfied with the State's explanation for the original's absence, and we have no reason to believe that the district court abused its discretion—both in its decision to admit the evidence and in its conclusion that "any editing or manipulation of that video . . . would go to the weight of that evidence and not to its direct admissibility." *See id.* ("The rule goes only to the competency of the evidence, not to its relevancy, materiality, or weight.").

**C. Sufficient Evidence Supported Manning's Conviction.** Manning challenges the sufficiency of the evidence to support his conviction for willful injury causing serious injury. The district court instructed the jury that the State had to prove the following four elements to convict Manning:

1. On or about December 26, 2022, [Manning] punched and/or kicked [Samuel].

2. [Manning] specifically intended to cause a serious injury to [Samuel].

3. The acts of [Manning] caused a serious injury to [Samuel].

4. [Manning] was acting without justification.

Manning only contests the second element, arguing that the State failed to present substantial evidence of his specific intent to cause a serious injury to Samuel as opposed to a bodily injury. We disagree.

The district court instructed the jury that " '[s]pecific intent' means not only being aware of doing an act and doing it voluntarily, but in addition, doing

it with a specific purpose in mind," and "serious injury" is "a bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or extended loss or impairment of the function of any bodily part or organ." Manning notes that he did not use a weapon during the assault, which broke out quickly, and there was no evidence of prior bad blood between the two that would allow jurors to conclude that Manning had the specific intent to seriously injure Samuel. But "[s]pecific intent is seldom capable of direct proof" and is often "shown by circumstantial evidence and the reasonable inferences drawn from that evidence." *State v. Ernst*, 954 N.W.2d 50, 55 (Iowa 2021) (quoting *State v. Walker*, 574 N.W.2d 280, 289 (Iowa 1998)).

Here, the State presented ample circumstantial evidence for the jury to infer Manning's specific intent to cause serious injury, especially viewing the evidence in the light most favorable to the State. *See Slaughter*, 3 N.W.3d at 546 (noting that we view any legitimate inferences or presumptions that may fairly and reasonably be deduced from the record in favor of the state). This included Samuel's testimony that Manning told him during the attack, "I will put you to sleep. I'll kill you. I will knock you out," the video footage, photographs of Samuel's injuries, and Manning's own admission upon his arrest to punching and kicking Samuel while he was on the ground. And despite Manning's claims that he "stayed in the car" and "locked the door on [Samuel] and somehow the door got unlocked," evidence supports the conclusion that Manning opened the door himself to initiate the altercation. Manning's lack of injuries also supports the State's claim that he did not act in self-defense. The sum of this evidence was sufficient to convince the jury of Manning's guilt beyond a reasonable doubt.

**III. Conclusion.**

For the above reasons, we vacate the court of appeals decision and affirm the district court judgment and sentence.

**Decision of Court of Appeals Vacated; District Court Judgment Affirmed.**